

# THE ATTORNEY GENERAL
# OF TEXAS

GERALD C. MANN
~~JOHNDOEXXDOEDOEXDOEDOEDOEXXX~~
ATTORNEY GENERAL

AUSTIN 11, TEXAS

Hon. C F. Petet, Secretary
Railroad Commission of Texas
Austin, Texas

Opinion No. O-1688

Re: The Railroad Commission of
Texas is authorized to see
that Article 6370 is com-
plied with, and may, in
its discretion, require
the erection of luminous
signs.

Dear Mr. Petet:

We acknowledge receipt of your opinion request of Novem-
ber 13, 1939, propounding some six questions with subsections re-
garding the power of the Railroad Commission. Your letter reads
in part as follows:

"Some railroads have old, wooden, unlighted
signs purportedly warning users of vehicles of the
nearness of tracks--such signs being located at
or near places where streets or highways intersect
railroad tracks; and, at one of these intersections
at least, there was a recent fatal accident in
which three young people were killed.

"We request an opinion on the following questions:

"FIRST: Does this Commission have the power
to enter and enforce a blanket general order re-
quiring all rail carriers to install at all such
crossings illuminous signs composed of a series
of buttons which shine at night when automobiles
approach them in such fashion as to warn approach-
ing vehicular traffic that a rail crossing is ahead
of such approaching traffic; and, if so, may such
order be entered without notice and hearing?

"SECOND: If such general order may not be
enforced, then may an order be entered applicable
to a given crossing or to given crossings; and,
if so, may such order be entered without notice
and hearing?

"THIRD: Do each of such orders, if any be possible, necessarily require notice and hearing and must the order be based upon a factual basis established by the evidence at such hearing, if any?

"...

"FIFTH: Assuming that the Commission should decide against such illuminous signs of the button type then we ask the same questions as those above (a) with respect to the ordering of the installation and use, in lieu thereof, of automatic bells ringing concurrently with the swinging of a sign latitudinally with the street or highway, (b) with respect to the ordering of the installation of automatic bells without the swinging signs, (c) swinging signs without the use of bells, and (d) with respect to ordering of the construction and use of underpasses or overpasses."

It is fundamental that the Railroad Commission of Texas has only powers expressly granted to it by statute, and impliedly may exercise only such powers as are necessary in the exercise of those expressly granted. Railroad Commission of Texas vs. Red Arrow Freight Lines, 96 S.W. (2d) 735. Article 6370, styled "Signs at Crossroads" reads as follows:

"Such corporation shall erect at all points where its road shall cross any first or second class public road, at a sufficient elevation from such public road to admit of the free passage of vehicles of every kind, a sign with large and distinct letters placed thereon, to give notice of the proximity of the railroad, and warn persons of the necessity of looking out for the cars; and any company neglecting or refusing to erect such signs shall be liable in damages for all injuries occurring to persons or property from such neglect or refusal. (P.D. 4890)"

Article 6448 provides in part as follows:

"The Commission shall: ... See that all laws of this State concerning railroads are enforced..."

It may be seen, therefore, that Article 6370 makes it mandatory on the railroads to erect at places where they cross first or second class public roads signs with large and distinct

letters to give notice and warning of the proximity of the cross-
ings, and Article 6448 makes it the duty of the Railroad Commis-
sion to see that Article 6370 is complied with.  It is within
the discretion of the Commission to determine what type of sign
comes within the classification set up by the Legislature in
Article 6370.  The Commission could, within its discretion, find
that, because of the speed of present-day traffic, ordinary let-
tering on signs is not distinct at night so as to warn present-
day motorists of the proximity of a railroad crossing.  The Com-
mission could also find that signs at least as visible as the
proposed luminous button signs are now necessary to fit the leg-
islative classification that the signs be distinct enough to warn
the traveling public.

If the Commission should promulgate an order requiring
the erection of the type of signs proposed herein, said order
would have to provide that the luminous button type sign was the
minimum standard of visibility for such railroad signs.  In other
words, the Commission could not require a railroad which had put
up a large electric light sign, one concededly more visible and
more desirable than the type proposed herein, to tear down such
sign and put up one of the luminous button variety.  The general
order of the Commission would have to set up a minimum standard,
rather than be a blanket order requiring all crossings to have
a particular type of sign.

The situation about which we are concerned here is
analogous, we believe, to the situation which confronted the San
Antonio Court of Civil Appeals in the case of San Antonio & A.P.
Ry. Co. v. Railroad Commission of Texas, 275 S.W. 261.  In the
San Antonio case an attack was made against an order of the Rail-
road Commission which order required the Railroad Company to move
the location of one of its depots.  In discussing the authority
of the Commission to promulgate such an order the Court said as
follows:

"Subdivision 12 of article 6654 and Article 6693, R.S.
1911, provide that railroad companies shall provide and
maintain at their several stations adequate, comfortable,
and clean depots and depot buildings for their passengers,
with separate apartments for white and negro passengers;
and that they shall keep and maintain adequate and suit-
able freight depots and buildings for receiving, handling,
storing, and delivering freight handled by the road. . . .

"The law required it to be, as a passenger depot, ade-
quate, comfortable, and clean.  As a freight depot it was
required to be adequate and suitable for receiving, handling

storing, and delivering freight. The new location was not only more easily accessible to the people of the town by reason of elimination of a stream crossing necessary in reaching the old depot, but was approximately a mile closer to the town. Both of these facts the railroad commission was entitled to consider in determining whether such depot met the requirements of the law that it should be adequate and suitable to the use of those who patronized the road. These provisions of the law were not intended to apply merely to the character of the building maintained. Certainly it could not be said that a depot building, meeting all other requirements of the law, but located in a swamp, on a precipice, or in some other inaccessible place, was either adequate or suitable to the public use contemplated by these provisions of the statute. Clearly it was within the power of the commission to require, within reasonable limitations, the railway company to repair, remodel, or expand its depot to meet the general requirements of the law, or, if necessary to do so, to tear down the old building and erect a new one. And if, within such reasonable limitations, in order to make such depot adequate and suitable for the purposes for which it was built, and, in order to serve the people of Center Point, it was necessary to move it approximately 4,000 feet from its old location, we think the Railroad Commission had authority to require the railway company to do so under the articles of the statute above cited, ..."

In discussing the authority of the Commission generally, the Court stated as follows:

"It is clear and well settled that the Railroad Commission is the agency created by the Legislature, not only to see that the laws regulating the operation of railroads are enforced, but likewise to make such reasonable regulations, orders, and rules, in the public interest, as may be necessary to compel such railroads to comply with and carry out the general provisions and requirements of the laws in their application to particular cases. Its power and authority is derived from the Constitution and the statutes, it is true, but of necessity the commission is vested in its functioning, with large discretion in applying the general provisions of the law to the concrete facts of a particular case. And, so long as their orders, rules, and regulations are designed to carry out the spirit and purpose of the statutes, they should be upheld, unless clearly so arbitrary and unreasonable as to impose an unfair burden upon the railroad company involved."

Hon. C. F. Petet, Page 5 (O-1688)


It is the opinion of this department, therefore, that the Railroad Commission has the duty to see that Article 6370 is complied with, and may in its discretion promulgate the type of order discussed herein concerning railroad crossing signs.

Because of our answer to your question No. 1, it is unnecessary to answer your question No. 2.

We do not perceive anything in the statutes upon which the Railroad Commission could predicate an authority impliedly or otherwise to issue an order requiring railroads to purchase or install safety devices not called for by the above-quoted statute. Accordingly, in response to your fifth question, should the Railroad Commission decide against the use of luminous signs it is our belief that it does not have the authority to require the installation in lieu thereof of automatic bells with or without swinging signs or the use of swinging signs without the bells, nor does it have the authority to require the construction and use of underpasses or overpasses.

You ask in the latter part of your first question, "may such order be entered without notice and hearing?" It is our belief that the Railroad Commission may without notice and hearing issue a blanket general order requiring all rail carriers to install at all railroad crossings signs at least as visible as those composed of a series of buttons which shine at night when automobiles approach them in such fashion as to warn approaching vehicular traffic that a rail crossing is ahead of such approaching traffic. Inasmuch as there is no statutory requirement for notice and hearing in respect to such an order, it is our belief that the case of Greer v. Railroad Commission of Texas, et al, 117 S.W. (2d) 142 (error dismissed), is controlling. We quote from that case as follows:

> "There is no compelling inherent reason why notice and hearing should be required as prerequisite to the validity of general rules and regulations of administrative boards... The intimate knowledge possessed by the Commission, ... affords ample basis for dispensing with notice when general regulatory orders are concerned. The wide variety of highway and traffic conditions may call for exceptions as regards given localities, particular classes of commodities or carriers, or even individual carriers. It would not be practical to consider all of these special cases in the promulgation of general regulations... Had the legislature intended that notice and hearing should be had in cases of general orders, it could easily

have so provided. Its absence in this regard, and its presence in the specifically enumerated cases, clearly indicate that in the former it was not deemed essential."

Regarding the question of notice and hearing, this Department has previously, in two opinions, expressed the opinion that in respect to such general matters as this no notice and hearing need be had. Opinion No. 0-1506, dated October 2, 1939, regarding the necessity for notice and hearing for the issuance of orders pursuant to the Gas Utilities Act, Article 6056. And opinion No. 0-1107, dated August 23, 1939, regarding the same question arising under the Motor Transportation Act.

Your fourth question reads as follows:

"FOURTH. Assuming that some of such crossings are located within the limits of incorporated cities and towns (some home rule and some operating under general laws) what effect does such assumed fact have on the jurisdiction of this Commission with respect to such signs (a) where the city fails or refuses to act (b) where the city acts but not to the extent desired by this Commission (c) where the city resists the activities of the Commission and (d) where the city is passive, inactive and non-commital?"

Your attention is called to the fact that Article 6370, supra, is specifically limited in its application to places where railroads cross first and second class roads. The classification of roads is set up in Article 6704 of the Revised Civil Statutes of 1925, as amended, which article reads in part as follows:

"The Commissioners Court shall classify all public roads in their counties as follows:

"1. First class roads shall be clear of all obstructions, and not less than forty (40) feet nor more than one hundred (100) feet wide; all stumps over six (6) inches in diameter shall be cut down to six (6) inches of the surface and rounded off, and all stumps six (6) inches in diameter and under, cut smooth with the ground, and all causeways made at least sixteen (16) feet wide, no first or second class road shall be reduced to a lower class.

"2. Second class roads shall conform to the
requirements of first class roads except that
they shall be not less than forty (40) feet wide.

"3. Third class roads shall not be less
than twenty (20) feet wide and the causeway not
less than twelve (12) feet wide; otherwise they
shall conform to the requirements of first class
roads."

We also call your attention to the following articles
of the Revised Civil Statutes of 1925:

Article 1016:

"Any incorporated city or town containing
not more than five thousand population in this
State shall have the exclusive control and power
over the streets, alleys, and public grounds and
highways of the city, . . ."

Article 1146:

". . .

"2. Have and exercise exclusive control over
the streets, alleys and other public places within
the corporate limits; provided, that with the
consent of the board of aldermen, where streets
are continuations of public roads, the commis-
sioners court shall have power to construct
bridges and other improvements thereon which
facilitate the practicability of travel on said
streets.

". . ."

Article 1175:

"Cities adopting the charter or amendment
hereunder shall have full power of local self-
government, and among the other powers that may
be exercised by any such city the following are
hereby enumerated for greater certainty: . . .

"16. To have exclusive dominion, control,
and jurisdiction in, over and under the public
streets, avenues, alleys, highways and boule-
vards, . . ."

Article 1175 is a part of the chapter of our statutes entitled "Home Rule." You are advised that any cities coming under the application of either of the above quoted articles have exclusive jurisdiction over their streets and roads, and the Railroad Commission would be unauthorized to promulgate any order which would interfere with such exclusive jurisdiction. This principle was affirmed by the Beaumont Court of Civil Appeals in the case of Fletcher v. Bordelon, 56 S. W. (2d) 313, writ of error refused. The Court stated as follows:

"The streets of cities are public highways, and under the primary control of the Legislature. The Home Rule Amendment to the State Constitution, article 11, Sec. 5, and article 1165 (1196a), R. S. 1925, which is the amended Constitution enacted into statutory form, together with article 1175 (1096d), R.S. 1925, a portion of what is known as its Enabling Act, confer upon cities full power of self-government, and delegate to cities operating under the Home Rule Amendment all power the Legislature had to control their streets, and to regulate traffic thereon. In addition to the provisions in the charter, the city could exercise all such authority in the control of its streets and the regulation of the use thereof as is granted by General Law."

While it might reasonably be contended that such an order of the Railroad Commission concerning railroad crossing signs would not be an unreasonable interference with a city's exclusive control over its streets, the above quoted statutes which grant the exclusive control to the cities over their streets have the effect of removing said streets from the category of "first or second class roads." The Beaumont Court of Civil Appeals in the case of Williams v. Carroll, 182 S. W. 29, stated as follows:

"In common usage, the term 'road' denotes a township or county highway. The road act, giving an action to any person damaged by means of insufficiency or want of repairs of any public roads of any of the townships of the state, has no application to an accident occurring in consequence of municipal streets in an incorporated municipality being out of order. Carter v. City of Rahway, 55 N. J. Law, 177, 26 Atl. 96.

"From these authorities it may be fairly deducible that a 'street', as that term is used, generally means a passageway within the bounds

of a municipal corporation, and that the word
'road' means a county highway forming a communi-
cation between the city limits of one city or
town and the city limits of another city or town.
That this is the meaning of the word 'streets,'
as the same appears in the Constitution, is
evident from the fact that the legislative body
of Texas, in dealing with a division of jurisdic-
tion over the public highways of the state, in
article 854, Vernon's Sayles' Texas Civil Stat-
utes, gives such incorporated cities or towns
the exclusive control and power over their streets,
alleys, grounds, and highways and to that end
grants them power to open, alter, widen, extend,
establish, regulate, grade, clean, and otherwise
improve the streets. . . ."

This case was later reversed by the Supreme Court of
Texas but on another ground.

Your attention is again called to the fact that Article
6370, supra, is expressly limited to crossings of first and second
class roads. You are therefore advised that Article 6370 would
not apply to railroad crossings in towns incorporated under the
above discussed provisions. This would preclude the Commission's
authority in the matter.

Your sixth question reads as follows:

"SIXTH: Does this Commission in each in-
stance have the power to place the entire expense
of each installation, regardless of which device
is resorted to, on the carrier involved or must
the expense be divided on a prorata basis between
the carrier and the Highway Department, when the
crossing is without a city's limits or between
the carrier and the city where the crossing is
within a city's limits -- such a division, if any,
to be upon a reasonable and equitable basis bottomed
on a factual ground to be found in the testimony
and in other facts of which the Commission may prop-
erly take notice?"

In response thereto your attention is called to the por-
tion of Article 6370 which reads as follows:

"Such corporation shall erect. . ."

You are therefore advised that said article requires the railroad corporation to erect the sign. It would have to do so at its own expense.

We trust that the foregoing discussion will be sufficient to enlighten you as to the authority of the Railroad Commission in this matter.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By  /s/ Billy Goldberg
        Billy Goldberg
                Assistant

BG:LM:LM

APPROVED FEB 29, 1940

/s/ Gerald C. Mann

ATTORNEY GENERAL OF TEXAS

APPROVED
OPINION
COMMITTEE

BY /s/ BWB
    CHAIRMAN